# IN UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **GOOD SAMARITAN HOSPITAL d/b/a MULTICARE GOOD SAMARITAN HOSPITAL**<br>401 15th Avenue Southeast<br>Puyallup, WA 98372<br><br>**VALLEY HOSPITAL & MEDICAL CENTER d/b/a MULTICARE VALLEY HOSPITAL**<br>12606 East Mission Ave<br>Spokane Valley, WA 99216<br><br>**YAKIMA VALLEY MEMORIAL HOSPITAL d/b/a MULTICARE YAKIMA MEMORIAL HOSPITAL**<br>2811 Tieton Drive<br>Yakima, WA 98902<br><br>Plaintiffs,<br><br>v.<br><br>**ROBERT F. KENNEDY, JR.,** In his Capacity as Secretary of the U.S. Department of Health and Human Services<br>200 Independence Avenue, S.W.<br>Washington, D.C. 20201<br><br>Defendant. | Case No. |

## COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

This is a civil action brought to obtain judicial review of a final decision rendered by the Provider Reimbursement Review Board (the "PRRB" or "Board"), acting as a component of the United States Department of Health and Human Services ("HHS"). The determination for which judicial review is hereby sought is the dismissal of PRRB Case No. 25-1505GC.

## JURISDICTION AND VENUE

1. This action arises under Title XVIII of the Social Security Act, as amended 42 U.S.C. §§ 1395 *et. seq*. (hereinafter, the "Medicare Act," the "Act," or the "Medicare program") and 5 U.S.C. §§ 706 *et. seq*. (hereinafter, the "Administrative Procedure Act" or the "APA").

2. The Medicare payment issue in this action pertains to how inpatient hospital days should be counted for purposes of calculating Plaintiffs' (hereinafter, "Plaintiffs," "Providers," or "Plaintiff Providers") respective Medicare Disproportionate Share Hospital ("DSH") payments for their cost reports ending within calendar year ("CY") 2008 included in the subject Common Issue Related Party ("CIRP") Group.

3. This Court has jurisdiction under 42 U.S.C. § 1395oo(f), and 28 U.S.C. § 1361. Venue lies in this judicial district pursuant to 42 U.S.C. § 1395oo(f), and 28 U.S.C. § 1391(e).

4. Further, this Court has jurisdiction under 42 U.S.C. § 1395oo(f), 28 U.S.C. § 1331, and 28 U.S.C. § 1391(e) because:

    A. Each Provider filed its cost report (for various fiscal year ends ("FYE"), *infra.*) as required by 42 U.S.C. § 1395oo(a);

    B. Each Provider was dissatisfied with its respective fiscal intermediary's final determination, ". . . as to the amount of total program reimbursement due the provider . . . for the period covered by such report," as required by 42 U.S.C. § 1395oo(a)(1)(A)(i);

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

C. The aggregate amount in controversy for the subject CIRP Group exceeds $50,000, as required by 42 U.S.C. § 1395oo(b);

D. Each Provider was timely added to the CIRP Group appeal with the PRRB pursuant to 42 U.S.C. §1395oo(a)(3);

E. The Board effectively dismissed the Providers' CIRP Group appeal by notifying each Provider on March 11, 2026, that the appeal in which it was participating had been dismissed;

F. In accordance with 42 U.S.C. § 1395oo(f)(1), this civil action is filed within sixty (60) days of the date that each Provider was notified by the PRRB in writing that its appeal was dismissed as evidenced by its letter dated March 11, 2026. (PRRB dismissal letter is attached hereto as **Exhibit A**).

5. Plaintiffs have exhausted all administrative remedies under federal law.

## **PARTIES AND RELEVANT AGENCIES**

6. Each Plaintiff herein is an acute care, in-patient healthcare facility that serves a disproportionate share of low-income patients. At all relevant times, each Plaintiff Provider had a Medicare provider agreement with the Secretary of HHS and was eligible to participate in the Medicare program. Per the "Schedule of Providers" (attached hereto as **Exhibit B**), this case is with respect to the three (3) Providers participating in the subject CIRP Group in PRRB Case No. 25-1505GC, with each such Provider appealing the same issue for CY 2008.[1]

7. Plaintiff GOOD SAMARITAN HOSPITAL d/b/a MULTICARE GOOD SAMARITAN HOSPITAL is located in Puyallup, WA 98372, Plaintiff VALLEY HOSPITAL & MEDICAL CENTER d/b/a MULTICARE VALLEY HOSPITAL is located in Spokane Valley,

---

[1] (Ex. B at 2).

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

WA 99216, and Plaintiff YAKIMA VALLEY MEMORIAL HOSPITAL d/b/a MULTICARE YAKIMA MEMORIAL HOSPITAL is located in Yakima, WA 98902.

8.      Defendant, Robert F. Kennedy Jr., Secretary of HHS (the "Secretary"), 200 Independence Avenue, S.W., Washington D.C. 20201, or his predecessors in office, is the federal officer responsible for the administration of the Medicare program. Defendant Kennedy is sued in his official capacity.

9.      The Centers for Medicare & Medicaid Services ("CMS" or the "agency") administers the Medicare program by delegation from, and as agent of, the Secretary.

10.     Medicare Administrative Contractors ("MACs" or individually "MAC") are organizations that administer the Medicare program in a given area under contract with CMS pursuant to 42 U.S.C. § 1395h. For the Medicare CIRP group appeal at issue, the MAC designated as the CMS representative was Noridian Healthcare Solutions ("NHS").

11.     The PRRB is an agency of HHS and acts as an administrative hearing body for Medicare reimbursement disputes between providers of Medicare services and MACs pursuant to 42 U.S.C. § 1395oo.

12.     As set forth more fully below, Plaintiffs object to the dismissal of their group appeal by the PRRB as arbitrary, capricious, and overly punitive. Moreover, through its actions, the Board clearly demonstrated its bad faith exercise of its discretion by dismissing Plaintiff's group appeal.

## MEDICARE STATUTORY AND REGULATORY BACKGROUND

**A.      General Background of the Medicare Program**

13.     Title XVIII of the Social Security Act, Pub. L. No. 89-97, 79 Stat. 291, as amended by 42 U.S.C. §§ 1395 *et. seq.* (hereinafter, the "Medicare program") establishes a program of medical benefits for persons aged 65 or older, for persons under age 65 who are disabled, and for

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

persons with end-stage renal disease. CMS, formerly the Health Care Financing Administration ("HCFA"), is the operating component of HHS charged with administering the Medicare program.

14.     CMS implements the Medicare program, in part, through the issuance of official Rulings.[2] In addition to the substantive rules published by the Secretary in the Code of Federal Regulations ("C.F.R.") and the rulings, CMS publishes numerous other interpretative rules implementing the Medicare program, which are compiled in one or more CMS Manuals. The Secretary also issues other sub regulatory documents to implement the Medicare program.

15.     The Medicare program is divided into five parts: A, B, C, D, and E. Two parts, Part A and Part C, are at issue here. Part A of the Medicare program provides for coverage and payment for, among others, inpatient hospital services on a fee-for-service basis.[3] Part A services are furnished to Medicare beneficiaries by "providers" of services, including the Providers, which have entered into written provider agreements with the Secretary, pursuant to 42 U.S.C. § 1395cc, to furnish hospital services to Medicare beneficiaries.

16.     In 1997, Section 4001 of the Balanced Budget Act of 1997, Pub. Law No. 105-33, added a new Part C to the Medicare statute to establish a Medicare program that was originally called the Medicare+Choice (also known as "M+C") program and is now called Medicare Advantage. A Medicare beneficiary can elect to receive Medicare benefits either through the original fee-for-service program under Medicare Parts A and B, or through enrollment in a Medicare Advantage plan under Medicare Part C.[4] That is, an individual who is entitled to benefits under Part A may enroll in a privately administered Medicare Advantage program in lieu of using Part A benefits.[5] Instead of making direct payments to providers, Medicare pays the Part C plans

---

[2] *See* 42 C.F.R. § 401.108.
[3] 42 U.S.C. §§ 1395c *et seq.*
[4] 42 U.S.C. § 1395w-21(a)(1); 42 C.F.R. § 422.50; *see also* 63 Fed. Reg. 34,968 (June 26, 1998).
[5] *See*, *Empire Health Found. for Valley Hosp. Med. Ctr. v. Azar*, 958 F.3d 873, 884–86 (9th Cir. 2020), *rev'd and remanded sub nom.*, *Becerra v. Empire Health Found. for Valley Hosp. Med. Ctr.*, 597 U.S. 424 (2022); *Northeast. Hosp. Corp. v. Sebelius*, 657 F.3d 1, 2 (D.C. Cir. 2011); *see also* 42 U.S.C. § 1395w-21(a)(1); *Montefiore Med. Ctr. v. Kennedy*, No. 24-1810 slip op at 2 (D.D.C. Sept. 30, 2025).

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

a pre-determined per-patient rate from the Part A and Part B trust funds.[6] A provider's inpatient days associated with patients who (for such days) were enrolled in Medicare Part C are referred to as "Part C days."[7]

**B.    The Medicare Hospital Inpatient Prospective Payment System**

17.    Medicare reimburses the operating costs of short-term acute care hospital inpatient services primarily through the hospital Inpatient Prospective Payment System ("IPPS").[8] The IPPS Statute (the "Statute") contains several provisions that adjust reimbursements based on provider-specific factors.[9] This case involves the provider-specific DSH adjustment, which requires the Secretary to provide increased IPPS reimbursement to providers that serve a "significantly disproportionate number of low-income patients."[10]

**C.    The DSH Payment Adjustment**

18.    The DSH program was enacted by Congress in the Consolidated Omnibus Budget Reconciliation Act of 1985 and was made effective beginning with discharges on or after May 1, 1986.[11]

19.    Whether a provider qualifies for the DSH adjustment, and how large an adjustment it receives, depends on the provider's "disproportionate patient percentage" ("DPP").[12] The DPP is the sum of two fractions, the so-called "Medicare Fraction" and the "Medicaid Fraction," for a provider's fiscal period.[13] Providers whose DSH percentages meet certain thresholds receive an adjustment which results in increased IPPS payments for inpatient hospital services.[14]

---

[6] 42 U.S.C. §§ 1395w-23(f), 1395w-21(i)(1).
[7] 88 Fed. Reg. 37,772 (June 9, 2023).
[8] 42 U.S.C. § 1395ww(d).
[9] *See* 42 U.S.C. § 1395ww(d)(5).
[10] 42 U.S.C. § 1395ww(d)(5)(F)(i)(I).
[11] Pub. L. No. 99272, § 9105, 100 Stat. 158-60 (Apr. 7, 1986).
[12] 42 U.S.C. § 1395ww(d)(5)(F)(v).
[13] 42 U.S.C. § 1395ww(d)(5)(F)(vi).
[14] 42 U.S.C. § 1395ww(d)(5)(F)(ii).

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

20.     The first fraction is the Medicare Fraction, also known as the "SSI Fraction." The Medicare Fraction's numerator is the number of a provider's inpatient days for patients who (for such days) were entitled to both Medicare Part A and Supplemental Security Income ("SSI") benefits for such period, and the denominator is the number of patient days for patients entitled to Medicare Part A.[15]

21.     The second fraction is the Medicaid Fraction. The Medicaid Fraction's numerator is the number of a provider's inpatient days for patients who (for such days) were eligible for medical assistance under a State Plan approved under Title XIX of the Social Security Act[16] for such period but not entitled to benefits under Medicare Part A, and the denominator is the total number of the provider's inpatient days for such period.[17]

22.     The Statute provides that a provider's DPP shall be determined according to the provider's cost reporting period.[18] The Secretary is not permitted to change the underlying substantive standards used in processing the provider's original DPP, regardless of whether such change would be beneficial or detrimental to the provider.

23.     The Secretary implemented the DSH program through the publication of an interim final rule on May 6, 1986.[19] Notwithstanding the clear language of the statutory provision regarding the DPP calculation, the Secretary determines a provider's DPP based on the Federal Fiscal Year ("FFY"). However, recognizing a provider's statutory right, the Secretary allows a provider to request that its DPP be redetermined based on the provider's cost reporting period.[20] Such a request is known as a request for "realignment."

---

[15] 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I).
[16] 42 U.S.C. § 1396-1 *et seq*.
[17] *Id*.
[18] 42 U.S.C. 1395ww(d)(5)(F)(vi) ("in this subparagraph, the term 'disproportionate patient percentage' means, with respect to a cost reporting period of a hospital...").
[19] 51 Fed. Reg. 16,772 (May 6, 1986).
[20] *See* 42 U.S.C. § 1395ww(d)(5)(F)(vi), (vi)(I); 51 Fed. Reg. 16,772, 16,777 (May 6, 1986).

7

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

**D.        Medicare Part C Policy, Rules, and Litigation**

24.        It is without question that prior to 2004, the Secretary treated Part C patients as not entitled to benefits under Part A and therefore did not include Part C patient days in the Medicare fraction.[21]

25.        Written guidance prior to 2004 repeatedly expressed the agency's policy that Part C days, which are days for which patients were not entitled to Part A payment, were to be excluded from Part-A-entitled days in the Medicare fraction.[22] This guidance included instructions to hospitals and program memoranda transmitting the Medicare fraction on an annual basis. From 1998 to 2004, the agency transmitted Medicare fractions that excluded Part C days, specifying that the fractions included only "covered Medicare days."[23]

26.        This approach of not including Part C days in the Medicare fraction reflected the original 1986 DSH regulation, which limited Part-A-entitled days in the Medicare to patient days that were "covered" by Medicare Part A.[24] The agency said as much when adopting the pre-2004 regulation, explaining that the numerator of the Medicare fraction included only "*covered Medicare Part A inpatient days.*"[25] Although the 1986 regulation did not expressly mention Part C patient days, it necessarily excluded them as days not covered and paid under Part A.[26] The DSH regulation prior to 2004 necessarily excluded Part C days from Part-A-entitled days because Part C days are not covered or paid under Part A.[27]

---

[21] *Allina Health Servs. v. Price*, 863 F.3d 937, 939 (D.C. Cir. 2017) (quoting *Northeast. Hosp. Corp.*, 657 F.3d at 15), *aff'd sub nom.*, *Azar v. Allina Health Servs.*, 587 U.S. 566 (2019) ("*Allina II*"); *Montefiore Med. Ctr.* slip op. at 35.

[22] *See Northeast Hosp.*, 657 F.3d at 15.

[23] *See* HCFA Pub. 60A, Transmittal No. A 98-36 (Oct. 1, 1998), *reprinted in* MEDICARE & MEDICAID GUIDE ("MMG") (CCH) ¶ 150,103; HCFA Pub. 60A, Transmittal No. A-99-42 (Sept. 1, 1999), *reprinted in* MMG ¶ 150,769; HCFA Pub. 60A, Transmittal No. A-00-54 (Aug. 17, 2000), *reprinted in* MMG ¶ 151,363; CMS Pub. 60A, Transmittal No. A-01-109 (Sept. 13, 2001), *reprinted in* MMG ¶ 152,216; CMS Pub. 60A, Transmittal No. A-02-086 (Sept. 11, 2002), *reprinted in* MMG ¶ 152,922; CMS Pub. 60A, Transmittal No. A-03-067 (Aug. 8, 2003), *reprinted in* MMG ¶ 153,554; CMS Pub. 100-04, Transmittal 275 (Aug. 13, 2004), *reprinted in* MMG ¶ 154,468.

[24] *See* 42 C.F.R. § 412.106(b)(2)(i); 42 C.F.R. § 409.3.

[25] 51 Fed. Reg. 16,772, 16,777 (May 6, 1986) (emphasis added).

[26] *See Cath. Health Initiatives Iowa Corp. v. Sebelius*, 718 F.3d 914, 921 n.5 (D.C. Cir. 2013).

[27] *See* 42 U.S.C. § 1395w-21(a)(1), (i); *see also Northeast Hosp. Corp. v. Sebelius*, 657 F.3d 1, 6 (D.C. Cir. 2011).

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

27.     Further, in 2003 (FY 2004), the Secretary issued a Proposed Rule proposing to clarify its policy and position that "once a beneficiary elects Medicare Part C, those patient days attributable to the beneficiary should not be included in the Medicare fraction of the DSH patient percentage."[28] The agency explained that "[t]hese days should be included in the count of total patient days in the Medicaid fraction (the denominator), and the patient's days for a [Part C] beneficiary who is also eligible for Medicaid would be included in the numerator of the Medicaid fraction."[29] It also explained that "once a beneficiary has elected to join [a Part C] plan, that beneficiary's benefits are no longer administered under Part A."[30]

28.     In a stunning reversal, in its Final Rule published in August 2004 (FY 2005), the agency engaged in a "volte-face" and "abruptly announced a change in policy."[31] Specifically, the Secretary announced that the agency would "adopt[] a policy" to *include* Part C days in the Medicare fraction and exclude them from the Medicaid fraction effective October 1, 2004.[32]

29.     In the 2004 Final Rule, the agency purported to amend the regulation text by deleting the word "covered."[33] Prior to 2004, the Medicare fraction included only "covered" days and thus did not include Part C days. Notwithstanding the removal of the word "covered" and the inclusion of Part C days in the Medicare fraction under the 2004 Final Rule, when the agency initially transmitted the Medicare Part Fractions for FYs 2005 and 2006, those fractions continued to *exclude* Part C days. More specifically the FY 2005 and 2006 transmittals conveying Medicare

---

[28] Medicare Program, Proposed Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2004 Rates, 68 Fed. Reg. 27,154, 27,208 (May 19, 2003) ("2003 Proposed Rule").

[29] *Id.*

[30] *Id.*

[31] *See, Allina Health II* at 939 (D.C. Cir. 2017) (quoting *Northeast Hosp. Corp. v. Sebelius*, 657 F.3d 1, 15 (D.C. Cir. 2011); *see also Allina Health Servs. v. Sebelius, 746 F.3d 1102, 1106 (D.C. Cir. 2014)*, aff'd, *Allina Health Servs. v. Sebelius, 746 F.3d 1102, 1106 (D.C. Cir. 2014) ("Allina I")*.

[32] 69 Fed. Reg. 48,916, 49,099 (Aug. 11, 2004) ("2004 Final Rule") (emphasis added); *see also Northeast Hosp.*, 657 F.3d at 16.

[33] 69 Fed. Reg. at 49,246.

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

fractions specified that the fractions include only "covered Medicare days," and consistently referred to "covered Medicare days."[34]

30.    Further, despite the Secretary's promulgation of the Final Rule in FY 2005, the C.F.R. was never actually amended. Therefore, to account for this, in August 2007 the Secretary issued what was termed a "technical correction" to the regulatory language seeking to conform the language of the C.F.R. to the 2004 Final Rule. The agency gave no notice to providers and no opportunity to comment.[35] Following the amendments in 2004 and 2007, the regulation provided that the Medicare fraction includes all patient days (not just "covered" days) for "patients entitled to Medicare Part A (*or Medicare Advantage (Part C)*)."[36] The amendment of the regulation was made effective October 1, 2007, the beginning of FY 2008.[37] The agency further amended the regulation in 2010 in its final IPPS rule "to use the word 'including' in place of 'or,' in an apparent attempt to bolster further" the agency's position on the treatment of Part C days.[38]

31.    Initially, the agency attempted to apply the 2004 Final Rule change retroactively to cost report years prior to October 1, 2004, the effective date of the 2004 Final Rule. On September 13, 2011, the Court of Appeals for the D. C. Circuit found that the agency's retroactive application of the 2004 Final Rule to periods prior to October 1, 2004, violated the Supreme Court's longstanding precedent articulated in *Bowen v. Georgetown University Hospital* because it "change[d] the legal consequences of treating low-income patients" and thus could not be applied retroactively.[39] The Court held that "the Secretary's present interpretation, which marks a

---

[34] *See* CMS Pub. 100-04, Transmittal 1091 (Oct. 27, 2006), *reprinted in* MMG ¶ 156,277 (); CMS Pub. 100-04, Transmittal 1396 (Dec. 14, 2007), *reprinted in* MMG ¶ 156,930.

[35] *Allina I*, 746 F.3d at 1106 n.3; see also Medicare Program; Changes to the Hospital Inpatient Prospective Payment System and Fiscal Year 2008 Rates, 72 Fed. Reg. 47,130, 47,384 (Aug. 22, 2007).

[36] *Id*. at 47,411 (amending §§ 412.106(b)(2)(i)(B) and (iii)(B)) (emphasis added).

[37] *Id*. at 47,130; *see also Allina I*, 904 F. Supp. 2d at 82.

[38] *Allina I*, 904 F. Supp. 2d at 82 n.5.

[39] *See Northeast Hosp.*, 657 F.3d at 13–17; *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

substantive departure from his prior practice of excluding [Part C] days from the Medicare fraction, may not be retroactively applied" to the fiscal years at issue.[40]

32.     After the *Northeast* decision, the agency acquiesced to and abided by the Court's decision. In June 2012, the agency published a transmittal TDL-12391.[41] The transmittal provided that in light of the *Northeast Hospital* decision, it was requiring MAC to "include any disallowed patient days attributable to patients who were enrolled in a Medicare Part C Plan and also eligible for Medicaid for discharges occurring on or after January 1, 1999 through September 30, 2004 in the Medicaid fraction" of the DSH calculation.[42] The agency specified that this relief should be applied to any cost reports that were not yet settled, as well as settled cost reports where the hospitals had filed proper appeals.[43]

33.     While the agency's attempt to apply the 2004 Final Rule retroactively to years prior to 2004 was struck down, the agency was attempting to apply the 2004 Final Rule prospectively. In July 2009, the agency first published Medicare fractions for provider cost reporting periods beginning in FY 2007. These fractions were the first ones to include Part C days. As a result, a number of providers challenged the 2004 Final Rule through administrative appeals initiated in 2009, arguing that (1) the new Part C days policy was not the "logical outgrowth" of the 2003 Proposed Rule "clarifying" the agency's former policy (but was actually departing from its former policy), and (2) the rule was arbitrary and capricious because the agency's "cursory explanation in the 2004 Final Rule" failed to acknowledge its departure from past policy and practice and ignored the "financial impact" of that departure.[44]

34.     On November 15, 2012, the District Court for the District of Columbia agreed with the providers and held that the policy announced in the 2004 Final Rule regarding Part C days was

---

[40] *Northeast Hosp.*, at 17.
[41] TDL 12391, 06-06-12 (June 12, 2012).
[42] *Id.* at 1.
[43] *Id.* at 1–2.
[44] *Allina Health Servs. v. Sebelius*, 904 F. Supp. 2d 75, 89, 83, 92–94 (D.D.C. 2012) ("*Allina I*").

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

not the logical outgrowth of the 2003 Proposed Rule.[45] The Court also held that the "cursory explanation in the 2004 Final Rule failed to meet the requirements of the APA" because "the Secretary[] fail[ed] to acknowledge her 'about- face,'" and "her reasoning for the change was brief and unconvincing."[46] Accordingly, the Court concluded that "[t]he portion of the 2004 Final Rule . . . that announced the Secretary's interpretation of the Medicare Disproportionate Share Hospital Fraction, as codified in 2007 at 42 C.F.R. § 412.106(b)(2) and as further modified in 2010, will be vacated, and the case will be remanded to the Secretary for further action consistent with this Opinion."[47] The Court also noted that the agency's argument that its then-"current interpretation [was] entirely consistent with the past" was "clearly forestalled by *Northeast Hospital*" and was "also irregular legal gamesmanship, which wastes time and casts unfortunate doubt on counsel's credibility."[48]

35.    On April 1, 2014, the D. C. Court of Appeals affirmed the district court's *Allina I* decision on the merits, "agree[ing] with the district court that the Secretary's final rule was not a logical outgrowth of the proposed rule."[49] The Court also found that the agency's argument "that the Secretary did *not* previously actually include Part C days in the Medicaid fraction . . . disregards [its] holding in *Northeast Hospital*, where [it] explicitly stated that the Secretary did have a prior practice of excluding Part C days from the Medicare fraction."[50] In reaching its conclusion, the Court explained that "a party reviewing the Secretary's notice of proposed rulemaking understandably would have assumed that the Secretary was proposing to 'clarify' a then-existing policy, i.e., one of *excluding* Part C days from the Medicare fraction and including them in the Medicaid fraction."[51] Instead, the Court reasoned, the agency's actions deprived the public of

---

[45] *Id.* at 89–92.
[46] *Id.* at 93 (quoting *Northeast Hosp.*, 657 F.3d at 15).
[47] *Id.* at 95.
[48] *Id.* at 77–78 n.2.
[49] 746 F.3d 1101, 1109 (D.C. Cir. 2014).
[50] *Id.* at 1108.
[51] *Id.* (emphasis added).

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

adequate opportunity for notice and comment before the final rule was promulgated in 2004. Because this procedural failure was a sufficient basis to vacate the 2004 Final Rule (as well as the agency's subsequent regulations issued in the 2008 final rule), the Court of Appeals did not reach the arbitrariness of the agency's explanation.[52] Accordingly, the Court of Appeals held that the District Court "correctly concluded that vacatur was warranted," vacated the rule and remanded the case.[53]

36.    In May 2013, the agency engaged in new proposed rulemaking (the "2013 Rule") on the treatment of Part C days. Specifically, "in an abundance of caution" the agency "proposed to readopt the policy of counting the days of patients enrolled in [Part C] plans in the Medicare fraction . . ." beginning October 1, 2013 (for FY 2014).[54] That is, the agency proposed – and then finalized – a rule in which Part C days would be included in the Medicare fraction *only prospectively*. Accordingly, as of October 1, 2013, the 2013 Final Rule governing the DSH calculation took effect – and is the same rule as the 2004 Final Rule that had been vacated but is applicable only for 2013 (FY 2014) and subsequent years.[55] The agency did not claim in this 2013 Final Rule that it had the authority to adopt the rule retroactively.[56] Thus, up until this point, no new rule had been adopted for fiscal years 2004-2013 following the D.C. Circuit's decision in *Allina I* to vacate the 2004 Final Rule.

37.    Notwithstanding this, in 2014 the Secretary published Medicare fractions for fiscal year 2012 which included Part C days. A number of providers appealed this action since the 2013 Final Rule applied to FY 2013 and thereafter. In *Allina II*, the United States Supreme Court held that the Secretary did not undertake appropriate notice-and-comment rulemaking when it applied

---

[52] *Id.* at 1111.
[53] *Id.*
[54] *See* 78 Fed. Reg. 27,486, 27,578 (May 10, 2013) ("2013 Final Rule").
[55] *See id.* at 50,619.
[56] *See id.* at 50,619–20.

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

its policy to fiscal year 2012, despite having no formal rule permitting this in place.[57] Unlike in *Allina I*, there was no rule to vacate in this instance, and the Supreme Court merely affirmed the D.C. Circuit's decision to remand the case "for proceedings consistent with [its] opinion." The Supreme Court did not reach the question of whether the policy to count Part C days in the Medicare fraction was impermissible or unreasonable.

38.     While the *Allina II* litigation was proceeding, on December 5, 2014, the agency issued a notice that a number of provider appeals were "now before the Administrator of CMS for a determination of the appropriate statutory interpretation in the absence of the vacated 2004 rule to be used to calculate the providers' DSH payment with respect to the treatment of the Part C days for FY 2007.[58] On January 23, 2015, the providers commented in response to the agency's notification of review on remand.[59] Among other comments, certain providers contended that the pre-2004 standard was reinstated by the vacatur of the 2004 rule[60] and that this standard could not be altered until the agency undertook notice-and-comment rulemaking.[61] They also argued that the agency's interpretation conflicts with Congressional intent[62] and that the agency should interpret "entitled" consistently throughout the Medicare statute.[63] They further asserted that public interest favors applying the pre-2004 standard because they made financial decisions in reliance on expected DSH payments consistent with those made under the agency's unchanged policy in the years immediately following the 2004 rule, until FY 2008 when the agency first implemented the change.[64]

---

[57] *Azar v. Allina Health Servs.*, 587 U.S. 566 (2019).
[58] *Allina Health Sys. v. Burwell*, No. 16-cv-150 (D.D.C. Jan. 29, 2016) ("*Allina III*"). *See* Pls.' Mem. in Opp'n to Def.'s Mot. to Dismiss Ex. 2, at 2, *Allina III*, No. 16-cv-150 (D.D.C. May 4, 2016), ECF No. 12-2.52.
[59] *See* Def.'s Mot.to Dismiss Ex. 7, at 4–7, *Allina III*, No. 16-cv-150 (D.D.C. Apr. 4, 2016), ECF No. 9-7.
[60] *see* Providers' Comments to CMS Adm'r on Remand, *Allina Health Servs. v. Blue Cross Blue Shield Ass'n*, PRRB Case Nos. 10-0165G et al. at 18–20 (Jan. 23, 2015)
[61] *See id.* at 21–30.
[62] *see id.* at 30–34
[63] *See id.* at 34–37.
[64] *See id.* at 17, 37–43.53.

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

39.    On December 2, 2015, the agency on remand reached the same conclusion as the vacated 2004 final rule and issued its "final administrative decision," concluding that "days associated with Medicare patients who are enrolled in a Part C plan are to be included in the numerator and denominator of the Medicare fraction."[65] The agency acknowledged, among other things, the Court of Appeals' *Northeast Hospital* holding that "the phrase 'entitled to benefits under part A' is ambiguous."[66] Thereafter, on January 29, 2016, *Allina III* was initiated by filing a complaint within 60 days of the agency's remand decision to challenge that "final administrative decision" on remand.[67] The government filed a partial motion to dismiss, which the Court denied, concluding that the Court had jurisdiction to hear the hospitals' challenge to the calculation of both the Medicare and Medicaid fractions.[68] The Court also concluded that the hospitals were not judicially stopped from pursuing the Medicaid fraction challenge.[69] Ultimately in 2019, the Court granted the government's motion for a remand to the agency.[70] The Court remanded the challenge to the CMS Administrator decision at issue without vacating it.[71]

40.    As is evident from the foregoing, the issue of the agency's inclusion of Part C days in the Medicare fraction has been litigated for over two decades, as the unexpected about-face reflected in the 2004 Final Rule significantly reduces providers' Medicare DSH payments. Notwithstanding the vacatur and the series of Court rulings taking the agency to task for its repeated attempts to retroactively apply a rule that is inconsistent with its long-standing pre-2004 policy, the Secretary has *yet again* issued a rule, the 2023 Final Rule, whereby it attempts to

---

[65] Def.'s Mot. to Dismiss Ex. 7, at 46, *Allina III*, No. 16-cv-150 (D.D.C. Apr. 4, 2016), ECF No. 9-7.
[66] *Id*. at 24 (citation omitted).
[67] *See* Compl., *Allina III*, No. 16-cv- 150 (D.D.C. Jan. 29, 2016).
[68] *Id.* at 17 (quoting *Allina I*, 746 F.3d at 1108 (emphasis omitted)).
[69] *Id.* at 26.
[70] *See* Order, *Allina III*, No. 16- cv-150 (D.D.C. Oct. 25, 2019), ECF No. 34.
[71] *Id.*; *see* Order at 2, *Allina III*, No. 16-cv-150 (D.D.C. Jan. 2, 2020), ECF No. 40 (clarifying that the October 2019 order "should not have referred to vacatur"); Order, *Allina III*, No. 16-cv-150 (D.D.C. Jan. 2, 2020), ECF No. 41 (amended October 2019 order).

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

retroactively apply a new policy of including Part C days in the Medicare fraction of DSH calculation for cost reporting years 2004-2013.

### E.    Retroactive Rulemaking: Case Law and the Medicare Statute

41.    The United States Supreme Court has made clear that retroactive rulemaking is generally disfavored in the law and that, unless provided for expressly, statutes granting administrative agencies the authority to engage in rulemaking should be construed as extending that authority <u>prospectively</u> only.[72]

42.    In 1988, the United States Supreme Court addressed retroactive rulemaking in the Medicare context, holding that the agency could not exercise its rulemaking authority to issue regulations limiting Medicare reimbursement retroactively.[73] In reaching this conclusion, the Supreme Court observed that "congressional enactments and administrative rules will *not* be construed to have retroactive effect *unless their language requires this result*."[74] The Court added that "a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress *in express terms*."[75]

43.    In his concurrence, Justice Scalia explained that rules are applied retroactively if they "alter [] the *past* legal consequences of past actions," and that when the Secretary prescribed "a formula for costs reimbursable while the prior rule was in effect, she changed the law retroactively."[76] Justice Scalia also added that a rule that exclusively regulates future behavior may still be invalid as arbitrary and capricious under the APA if such rule "makes worthless substantial

---

[72] *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988); *Landgraf v. USI Film Prods.*, 511 U.S. 244, 245 (1994); *Republic of Austria v. Altmann*, 541 U.S. 677, 696 (2004) ("The aim of the [anti-retroactivity] presumption is to avoid unnecessary post hoc changes to legal rules on which parties relied in shaping their primary conduct.").
[73] *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. at 215.
[74] *Id.* at 208 (emphases added).
[75] *Id.* (emphasis added).
[76] *Id.* at 219–20 (Scalia, J., concurring).

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

past investment incurred in reliance upon the prior rule."[77] He explicitly rejected the Secretary's assertion that the presumption against retroactivity does not apply to reasonable "curative" rulemaking. So-called "curative" rulemaking occurs to correct a mistake in an earlier rulemaking proceeding. In emphasizing that he "would assuredly not sanction 'curative' retroactivity," Justice Scalia opined that permitting such "curative" rulemaking "would 'make a mockery . . . of the APA,' since 'agencies would be free to violate the rulemaking requirements of the APA with impunity if, upon invalidation of a rule, they were free to "reissue" that rule on a retroactive basis.'"[78]

44.     In 1994, the Supreme Court stated that "[t]he presumption against statutory retroactivity is founded upon elementary consideration of fairness dictating that individuals should have an opportunity to know what the law is and to conform their conduct accordingly."[79] The Court explained that "the anti-retroactivity principle finds expression in several provisions of our Constitution," including the Ex Post Facto and Due Process Clauses as well as the prohibitions on Bills of Attainder.[80]

45.     Importantly, in 2003, Congress enacted 42 U.S.C. § 1395hh(e)(1), which prohibits the retroactive application of a substantive change in regulations, manual instructions, interpretive rules, statements of policy or guidelines unless the Secretary determines that one of two very narrow exceptions are met. The Secretary must determine that either "such retroactive application is necessary to comply with statutory requirements,"[81] or the "failure to apply the change retroactively would be contrary to the public interest."[82] If the Secretary fails to meet either exception, the Medicare statute provides that the substantive change "shall not become effective

---

[77] *Id.* at 220.
[78] *Id.* (alteration in original) (citation omitted); *Id.* at 225.
[79] *Landgraf v. USI Film Prods.*, 511 U.S. at 245 (1994).
[80] *See id.* at 266.
[81] *id.* § 1395hh(e)(1)(A)(i)
[82] *Id.* § 1395hh(e)(1)(A)(ii).

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

before the end of the 30-day period that begins on the date that the Secretary has issued or published . . . the substantive change."[83] The Medicare statute further states that "[n]o action shall be taken against a provider of services or supplier with respect to noncompliance with such a substantive change for items and services furnished before the effective date of such a change."[84]

46.    Congress enacted this provision expressly to limit the Secretary's power to undertake retroactive rulemaking. Before this 2003 amendment, the Medicare Act was silent regarding retroactive rulemaking.

**F.    Retroactive Rulemaking: Case Law and the Medicare Statute**

47.    Section 4001 of the Balanced Budget Act of 1997, Pub. Law No. 105-33 added Part C to the Medicare statute to establish the Medicare Advantage program. From that time until 2004, the agency did not include patients with Part C benefits in the Medicare fraction because Part C enrollees were not treated by the agency as being "entitled to benefits under Part A."

48.    In 2003, CMS published a Proposed Rule in which it proposed codifying its longstanding practice of *excluding* Part C days in the Medicare fraction.[85] However, in its Final Rule published in August 2004, the agency abruptly announced a change in policy that was directly opposite from its longstanding policy, which it codified in its 2003 Proposed Rule. In this Final Rule, CMS stated that it would adopt a policy to *include* Part C days in the Medicare Part A Fraction and exclude them from the Medicaid fraction, effective October 1, 2004.[86]

49.    As discussed above, in 2010 in *Allina I*, a number of providers challenged the validity of the 2004 Final Rule in the District of Columbia. The district in that case vacated the 2004 Final Rule, which the D. C. Circuit affirmed, finding that the 2004 Final Rule was not a "logical outgrowth" of the proposed rule which had contemplated *excluding* patient days

---

[83] 42 U.S.C. § 1395hh(e)(1)(B)(i).
[84] *Id.* § 1395hh(e)(1)(C).
[85] 68 Fed. Reg. 27,208 (May 19, 2003).
[86] 69 Fed. Reg. 48,916, 49,099 (Aug. 11, 2004).

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

associated with Part C beneficiaries from the Medicare fraction and including them in the numerator of the Medicaid fraction. The about-face taken by CMS in the 2004 Rule thus violated the Medicare statute's notice-and-comment requirements because the interested parties had not been put on notice that the Secretary may adopt a final policy of counting Part C days in the Medicare fraction.[87] In fact, the Court in the *Northeast Hospital* case found that the agency's "actual treatment of [Part C] days" as well as its "statements in the 2004 rulemaking and in a subsequent 2007 technical revision confirm that [it] changed [its] interpretation of the DSH provision in 2004," and "belie[d] [its] claim that" the 2004 Rule merely "codified a longstanding policy."[88]

50.      In response to *Allina I,* in 2013 CMS published a new final rule (the "2013 Final Rule") in which it adopted the policy of treating Part C enrollees as "entitled to benefits under Part A" and thus to include Part C days in the Medicare fraction on a *prospective* basis.[89]

51.      In 2014, CMS posted the Medicare fractions for Fiscal Year 2012 on its website and noted that the calculations included Part C patients.[90] Some of the *Allina I* plaintiffs challenged the practice because the 2004 Final Rule had been vacated and the 2013 Rule was intended to only be prospective.[91] Ultimately, the United States Supreme Court held that the published fractions amounted to a "statement of policy" that was subject to the Medicare statute's notice-and-comment requirements and that the agency had not identified a lawful excuse for neglecting its notice-and-comment obligations.[92] Consequently, HHS could not rely on the published fractions.

52.      Thus, in a series of rulings, the agency has suffered defeat numerous times in the District of Columbia Court of Appeals and the United States Supreme Court over its policy change.

---

[87] *Allina I* at 1109-10; *see also, Montefiore Med. Ctr.* No. 24-1810, slip op. at 8 (citing *Allina I*).
[88] 657 F.3d at 15–16.
[89] *See* 78 Fed. Reg. 50,496, 50,614 (Aug. 19, 2013).
[90] *Allina II*, 587 U.S. at 571.
[91] *See id.* at 571-72.
[92] *Id.* at 572-73, 583-84.

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

Instead of properly reimbursing safety-net hospitals in accordance with its pre-2004 policy, the agency once again unfairly seeks to readopt – on a retroactive basis – the same policy more than twenty years after the agency first attempted to adopt the same change in its 2004 Final Rule and more than a decade after readopting the same standard in a prospective-only 2013 Final Rule. Courts have repeatedly invalidated the 2004 Final Rule and the Secretary's repeated attempts to retroactively include Part C days in the Medicare fraction. As set forth in detail above, in 2011 in the *Northeast Hospital* case, the Court of Appeals found the Secretary's attempt to apply the 2004 Final Rule to periods prior to 2004 impermissibly retroactive. Three years later in 2014, the Court in *Allina I* vacated the 2004 Final Rule, finding that it was not a logical outgrowth of the 2003 Proposed Rule. *Allina I* at 1105. And in *Allina II,* which was affirmed by the United States Supreme Court, the Court held that the agency must undertake notice-and-comment rulemaking before effectuating the policy reflected in the vacated 2004 Final Rule.

53.     Notwithstanding the substantial time, effort, and money that providers have had to expend to repeatedly challenge the Secretary's continuing quest to deny providers appropriate DSH payments by promulgating retroactive and arbitrary and capricious rules that are not in accordance with law, the Secretary continues to do so. In 2020, CMS issued a notice of proposed rulemaking that would treat Part C enrollees as "entitled to benefits under [P]art A" and include them in the Medicare fraction for the years *before* Fiscal Year 2014.[93] Roughly three years later in 2023, after the end of the notice-and-comment period, the agency published its final rule (the "2023 Final Rule") in which it adopted its proposed rule's interpretation that Part C beneficiaries are "entitled to benefits under Part A" and therefore will be included in the Medicare fraction. While the effective date for this rule was August 8, 2023, the agency stated that it would apply the rule

---

[93] *See* Medicare Program; Treatment of Medicare Part C Days in the Calculation of a Hospital's Medicare Disproportionate Patient Percentage, 85 Fed. Reg. 47,723, 47,725 (Aug. 6, 2020).

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

*retroactively* to DSH payment adjustments prior to 2013 (FY 2014).[94] This is the same Medicare DSH payment standard change on Part C days in the DSH calculation reflected in the prior publications vacated in *Allina I* and *Allina II,* as well as the prospective-only 2013 Final Rule.

54.    As specifically stated by the agency "[I]n this final action we are adopting the same policy of including [Part C] patient days in the Medicare fraction that was prospectively adopted in the FY 2014 IPPS final rule and applying this policy retroactively to any cost reports that remain open for cost reporting periods starting before October 1, 2013."[95] The agency newly claimed— which is inconsistent with its proposed rule—that its interpretation of the DSH statute as to Part C days is statutorily required following the Supreme Court's decision on a different category of days in *Empire Health*.[96] The agency also asserted, in the alternative, that its retroactive rulemaking is necessary and proper to comply with the Supreme Court's decision in *Allina II* and "to establish" the Part C standard for cost years before October 1, 2013.[97] Following this final agency action in the final rule, a number of providers challenged the rule for their cost years beginning in 2007.[98]

## THE RELEVANT MEDICARE APPEALS PROCESS

55.    At the close of its fiscal year ("FY"), a provider must submit a cost report to the MAC showing the costs it incurred during the fiscal year and the portion of those costs to be allocated to Medicare.[99] Under the Medicare program, each hospital's MAC is required to analyze and audit the hospital's annually submitted Medicare cost report and issue a Medicare Notice of Program Reimbursement ("NPR"), which informs the hospital of the final determination of its total Medicare reimbursement for the hospital's FY.[100] The MAC also makes estimated

---

[94] *See*, Medicare Program; Treatment of Medicare Part C Days in the Calculation of a Hospital's Medicare Disproportionate Patient Percentage, 88 Fed. Reg. 37,772 (June 9, 2023).
[95] *Id* at 37,792.
[96] *See id.* at 37,775.
[97] *Id.* at 37,776; *see* 88 Fed. Reg. at 37,772.
[98] *See* Compl., *Allina Health Sys. v. Becerra*, No. 1:23-cv-02144 (D.D.C. July 24, 2023) ("*Allina IV*"), ECF No. 1.
[99] 42 C.F.R. § 413.20.
[100] 42 C.F.R. § 405.1803.

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

payments to providers on an interim basis as claims are paid throughout a cost reporting period, including DSH payments.[101] In addition to including costs on its cost report, a hospital is also required to make a claim, or alternatively self-disallow, for any adjustment to its basic IPPS payment adjustment, such as the DSH adjustment.[102]

56.    In certain circumstances, a MAC may issue revisions to an NPR in the form of a Revised Notice of Proposed Reimbursement ("RNPR"). Such circumstances include, but are not limited to, when a provider requests redetermination of a claim, when CMS issues a new policy or correction that requires reprocessing claims, or when providers request a realignment.[103] A revised NPR is issued where the end result is changed, or where the end result is not changed, but a party might be disadvantaged by the revision.[104]

57.    If a hospital is dissatisfied with its MAC's final determination (or any revised final determination) of the hospital's total Medicare program reimbursement for a fiscal year, as reflected in the NPR, and the hospital satisfies the amount in controversy requirements, the hospital has a right to obtain a hearing before the Board by filing an appeal within 180 days of receiving its NPR (or any revised NPR).[105] A provider may also appeal an NPR or RNPR even where the listed impact on reimbursement is zero. 42 C.F.R. § 405.1835(a)(1) which sets forth separate requirements for provider dissatisfaction and for amount in controversy. In *Banner Heart Hospital v. Burwell*, the district court noted that the futility of claiming an amount doesn't prevent appealing a provider's dissatisfaction with determinations.[106] Furthermore, specifically with respect to 88 Fed. Reg. 37,772 published on June 9, 2023 (i.e., the 2023 Final Rule), the Secretary has conceded

---

[101] *See* Medicare Claims Processing Manual, CMS Pub. 100-04, ch. 3, § 20.3 (2025); 42 C.F.R. § 413.64(f)(2); Medicare Fin. Mgmt. Manual, CMS Pub. 100-06, ch. 8, § 10.5 (2009), *available at* https://www.cms.gov/regulations-and-guidance/guidance/manuals/downloads/fin106c08.pdf.
[102] 42 C.F.R. § 413.24(j).
[103] *See* 42 C.F.R. § 1803; 42.C.F.R. § 412.106(b)(3).
[104] Medicare Claims Processing Manual, ch. 34, § 10.9 (2019), *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/clm104c34.pdf.
[105] 42 U.S.C. § 1395oo(a); 42 C.F.R. § 405.1835(a).
[106] *Banner Heart Hospital v. Burwell*, 201 F. Supp. 3d 131 (D.D.C. 2016).

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

that providers may appeal any NPR or RNPR issued following the publication of that Final Rule—even where the stated impact of including Part C days in the Medicare fraction is zero.

58.     Specifically, in *Allina Health System. v. Becerra*, the Department of Justice stated the following on behalf of the Secretary: "The agency has repeatedly made clear that providers will have the right to appeal from NPRs and RNPRs issued pursuant to the 2023 Final Rule—regardless of whether the providers' DSH payment amounts change thereunder. The 2023 Final Rule itself confirms this point."[107] Similarly, in response to comments voicing the same concern about the appealability of RNPRs, CMS stated as follows:

> Providers who have pending appeals reflecting fractions calculated in the absence of a valid rule will receive NPRs or revised NPRs reflecting DSH fractions calculated pursuant to this new final action and will have appeal rights with respect to the treatment of Part C days in the calculation of the DSH fractions contained in the NPRs or revised NPRs. Providers whose appeals of the Part C days issue have been remanded to the Secretary will likewise receive NPRs or revised NPRs reflecting fractions calculated pursuant to this new final action, with attendant appeal rights. Because NPRs and revised NPRs will reflect the application of a new DSH Part C days rule, CMS will have taken action under the new action, and the new or revised NPRs will provide hospitals with a vehicle to appeal the new final action *even if the Medicare fraction or DSH payment does not change numerically*.[108]

The agency hardly could have been clearer: providers have a right to appeal from NPRs and revised NPRs issued in accordance with the 2023 Final Rule "even if the . . . DSH payment does not change numerically."[109]

59.     The Board itself has also repeatedly confirmed that providers will have a right to appeal from NPRs and RNPRs. Indeed, the Board confirmed this directly to one of the providers in this case only a few months ago after that provider brought a premature Board appeal seeking to challenge the 2023 Final Rule. In dismissing the appeal and denying the plaintiff's request for EJR, the Board explained: "[a]s noted in the preamble to the June 2023 Final Rule . . . , providers

---

[107] *Allina Health System. v. Becerra*, No. 1:23-cv-02144-LLA (D.D.C. 2024) ("*Allina IV*"). *See* Def.'s Reply Mem. In Supp. of Def.'s Mot. to Dismiss Amended Compl. at 14 (Document 19 filed 1/24/2024).
[108] *See* 88 Fed. Reg. 37,772, 37,788 (June 9, 2023) (emphasis added).
[109] *Id.*

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

may appeal NPRs or revised NPRs that are subsequently issued and reflect this policy [i.e., the policy of putting Part C days in the Medicare fraction]."[110] And in a more recent decision denying the same hospital's reconsideration request, the Board reiterated that, "as noted in the preamble to the June 2023 Final Rule, providers such as Tampa may challenge that policy by filing an appeal based on the relevant NPR/revised NPR that will soon be issued reflecting this policy."[111] In addition to having the authority to make substantive decisions concerning Medicare reimbursement appeals, the Board is authorized to decide questions relating to its jurisdiction and procedure.[112] Further, the Board is required to "affirm, modify, or reverse . . . **and** to make any other revisions on matters covered by such cost report[.]"[113] That is, the Board cannot avoid making necessary revisions on matters properly before it.

60.     The decision of the Board on substantive or jurisdictional issues constitutes final administrative action unless the Secretary reverses, affirms, or modifies the decision within 60 days of the hospital's notification of the Board's decision.[114] The Secretary has delegated its authority under the statute to review the Board decisions to the CMS Administrator.[115] Thus, the Secretary's final administrative decision for purposes of judicial review is either the decision of the Board or the decision of the CMS Administrator after reviewing the Board's decision.[116]

61.     A hospital may obtain judicial review by filing suit within sixty (60) days of receipt of the Secretary's final administrative decision in the United States District Court for the judicial

---

[110] *See* Provider Reimbursement Review Board Letter, Tampa Gen. Hosp., PRRB Case No. 23-1498, at 20 n.83 (Aug. 8, 2023), available at https://www.cms.gov/files/document/prrb-jurisdictional-decisions-8-1-2023-through-8-31-2023.pdf (last visited November 2, 2025); *see also id.* at 8.

[111] *See* Provider Reimbursement Review Board Letter, Tampa Gen. Hosp., PRRB Case No. 23-1498, at 4 (Nov. 27, 2023), available at https://www.cms.gov/files/document/prrb-jurisdictional-decisions-11-1-2023-through-11-30-2023.pdf (last visited November 2, 2025); *Allina IV*, Def.'s Reply Mem. in Supp. of Def.'s Mot. to Dismiss the Amended Complaint at 14-15, (Document 19 Filed 01/24/24), (emphasis in the original, references to exhibits deleted).

[112] *See* 42 U.S.C. § 1395oo.

[113] *See* 42 U.S.C. § 1395oo(d) (emphasis added).

[114] 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. §§ 405.1875, 405.1877.

[115] *See* 42 C.F.R. §§ 405.1875, 405.1877.

[116] *See* 42 C.F.R. § 405.1877(a)(2).

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

district in which the hospital is located or in the United States District Court for the District of Columbia.[117] The date of receipt of such a decision is presumed to be five (5) days after the date of issuance.[118] The Secretary is the proper defendant in such an action.[119] Under 42 U.S.C. § 1395oo(f)(2), interest is to be awarded in favor of the prevailing party in an action brought under 42 U.S.C. § 1395oo(f). Under 42 U.S.C. § 1395g(d), CMS is required to pay interest on underpayments to Medicare providers, if the underpayment is not paid within thirty days of a "final determination."

## APPLICABILITY OF THE APA TO MEDICARE APPEALS

62.      Under 42 U.S.C. § 1395oo(f)(1), an action brought for judicial review of final agency action involving PRRB appeals "shall be tried pursuant to the applicable provisions under chapter 7 of title 5 of the U.S. Code, which contains the APA. Under the APA, a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"[120]

## FACTS SPECIFIC TO THIS MATTER

63.      It is acknowledged by the PRRB that it received Plaintiffs' timely CIRP Group Appeal Request. The subject of the CIRP group appeal was described as: "Part C Days Retroactive Final Rule" (CIRP group appeal request attached as **Exhibit C**).[121]

64.      In Plaintiffs' CIRP group appeal, the CIRP group disputed the MAC's calculation of Plaintiffs' respective Medicare reimbursements "…by including Part C patient days in the denominator of the Medicare Fraction component of the Disproportionate Payment Percentage (DPP). Per the Part C Days retroactive final rule, 88 Fed. Reg. 37,772 (June 9, 2023), the MAC

---

[117] 42 U.S.C. § 1395oo(f)(1).
[118] *See* 42 C.F.R. § 405.1801(a)(1)(iii).
[119] *See* 42 C.F.R. § 405.1877(a)(2).
[120] 5 U.S.C. § 706(2)(A).
[121] (Ex. C at 2).

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

included Part C Days from the Providers' cost year(s) at issue in the Medicare Fraction." (CIRP group issue statement, attached as **Exhibit D**).[122]

65.     The CIRP group further contended:

> …that the Part C Days retroactive final rule is void and without legal effect because the Secretary had no authority under section 1871(e) of the Social Security Act, 42 U.S.C. § 1395hh(e), or otherwise, to issue such a retroactive rule. Such rule also is contrary to the 1986 final rule, which, following the invalidation of 2004 final rule on Part C Days in *Allina Health Servs. v. Sebelius*, 746 F.3d 1102 (D.C. Cir. 2014), remains in effect. The 1986 final rule provides that the denominator of the Medicare Fraction consists of only 'covered Medicare Part A inpatient days,' which term does not include Part C Days. *See* 51 Fed. Reg. 16,772, 16,777 (May 6, 1986). *See also* 51 Fed. Reg. 31,454, 31,460–61; *Cath. Health Initiatives-Iowa Corp. v. Sebelius*, 718 F.3d 914, 921 n.5 (D.C. Cir. 2013) (noting that the pre-2004 regulation limited the Medicare Part A/SSI fraction to 'covered Medicare Part A inpatient days' (citing 51 Fed. Reg. at 16,777)). Such rule is also arbitrary and capricious and contrary to the statutory meaning of 'entitled to benefits under part A' in section 1886(d)(5)(F)(vi)(I), 42 U.S.C. § 1395ww(d)(5)(F)((vi)(I).[123]

66.     On January 29, 2026, the Board issued a "Board Determination: Failure to Respond to Full Formation Comments" (attached as **Exhibit E**) requiring the following of Plaintiffs and their representative:

> *Within 15 days of this notification*, the Group Representative must file a response showing cause as to why Case No. 25-1505GC should not be dismissed for failure to **timely** respond to the Board Notice which set January 21, 2026 as the deadline for the Group Representative to inform the Board regarding the group's full formation. *Failure of the Group Representative to file its response by this deadline will result in the Board taking remedial action and the case will be dismissed*.[124]

67.     Plaintiffs' representative for the subject CIRP group was Quality Reimbursement Services, Inc. ("QRS"). A staff member of QRS, on behalf of QRS and Plaintiffs, filed a *timely*

---

[122] (Ex. D at 2).
[123] (Ex. D at 2).
[124] (Ex. E at 3).

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

response on February 5, 2026 (attached as **Exhibit F**) to the Board's Show Cause Scheduling

Order issued on January 29, 2026, stating that:

> On January 21, 2026, QRS timely responded to the Board's request for 'Comments Regarding Full Formation' status. I, as the QRS staff person assigned to designate the group as fully formed and complete, performed the following steps:
>
> 1. I selected the 'Respond' box, which directed me to a page asking, 'Is the group fully formed?'
> 2. I clicked on the Yes button and submitted the response.
> 3. Upon submission, the OH CDMS portal redirected me to a page stating that 'No actions exist for this case.'
>
> Although I performed the standard procedures to designate the group as fully formed, no confirmation was received. As it is not uncommon to experience delays in the issuance of confirmations, I presumed that a confirmation email would be received shortly.[125]

68.    QRS also included an internal record showing the completion of the Board's

"Comments Regarding Full Formation" January 21, 2026 deadline in its response. QRS further

contended that:

> …at the time of the designation of the instant group as being complete, the OH CDMS portal had been experiencing technical issues over the previous few weeks and the absence of confirmation may have resulted from those system issues. At that time, I notified the OH CDMS Help Desk of the deadlines due on January 21, 2026 and the related communication is attached. Although the ServiceNow case reflects a completed status, technical issues continue to persist.[126]

69.    QRS continued, stating that dismissal of the subject appeal would not have been

"appropriate as QRS timely and in good faith designated the group as complete on January 21,

2026 in compliance with the deadline established by the PRRB."[127]

70.    Despite the QRS performing "…the standard procedures to designate the group as

fully formed," the PRRB maintained that "QRS has failed to meet its responsibilities per Board

---

[125] (Ex. F at 2).
[126] (*Id.*)
[127] *Id.*

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

Rule 5.2, which require the representative to meet Board deadlines and respond timely to correspondence or requests from the Board," additionally stating that "when QRS failed to receive its [Confirmation of Correspondence] for the 'Group's Comments Regarding Full Formation' submission, it did not send a follow-up letter (as it did in Case No. 25-1356GC). In addition, QRS did not file a request for extension as indicated in Board Rule 2.1.3, nor is there evidence of a timely response in OH CDMS."[128] The Board claimed that because "…QRS waited for the Board to address the deficiency[129] by issuing a Show Cause Order on January 29, 2026, more than a week after the deadline had passed and the OH CDMS systems issues had been fixed," it found the lack of a "Group's Comments Regarding Full Formation" submission to be a "…case of administrative error and QRS not properly managing its docket…" and that this was "…likely an operator error, rather than system related."[130]

71.      Finally, the Board exercised "its discretionary authority in 42 C.F.R. § 405.1868 and Board Rule 41.2" to dismiss Plaintiff's appeal.[131]

72.      What is particularly disquieting about the Board's termination of Plaintiffs' appeal rights using its discretionary authority to do so, arises from the tone of its January 29, 2026 letter,[132] wherein the Board, while on the one hand expressly "requires" Plaintiffs' representative to file a written response as to "…why Case No. 25-1505GC should not be dismissed," nevertheless comes across as having already predetermined Plaintiffs' fate (a dismissal) regardless of the *nature* of the excuse expressed. Such that, *any* valid excuse expressed by the representative for its failure to timely respond to the Board's Acknowledgement and Critical Due Dates ("ACDD") Notice setting January 21, 2026 as the deadline to inform the Board regarding the appeal group's full formation

---

[128] (Ex. A at 4).
[129] [*i.e.*, lack of receipt of confirmation of correspondence of its "Group's Comments Regarding Full Formation" submission]
[130] (*Id.*)
[131] (*Id.*)
[132] (Ex. E)

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

would be rejected outright as the decision to dismiss Plaintiffs' appeal was already a *fait accompli*.[133]

73.     What is perhaps most appalling, however, is the fact that despite the Board's overt acknowledgment in its Determination letter[134] that, "**Although there were documented systems issues with OH CDMS on January 20 and 21, 2026**," it nevertheless found it appropriate and a better tact to turn the table and seek to put full blame upon Plaintiffs' representative by stating that, "Considering the *technical difficulties QRS experienced* in this case, a logical course of action would be for QRS to examine other groups that had submissions filed during the same time period."[135] Not only was it supercilious for the Board to cast blame upon Plaintiffs' representative despite its acknowledgment of the "documented systems issues with OH CDMS" that very day, but it then went on to advise them essentially what other steps the representative's office *should* have pursued as constituting further efforts–all this written in the face of the *technical difficulties* with the data management system *operated by the agency*.

74.     The Board's *discretionary* determination to levy the ultimate penalty upon Plaintiffs (*i.e.*, dismissal of their appeal) more than implied the Board's *bias*: as it finalized its decision to dismiss, it chose to take yet another "shot" at Plaintiffs' representative, QRS, stating, "…the Board finds this to be *another* case of administrative error and QRS not properly managing its docket."[136]

75.     This severe assessment appears to be borne out by the facts: In its January 29, 2026 Determination letter,[137] the Board acknowledged that by not responding to its imposed January 21, 2026 deadline to the group's full formation, stating:

> …the Group Representative has effectively abandoned the appeal…

---

[133] (Ex. A at 2).
[134] (*id.* at 3).
[135] (*Id.* at 4) (emphasis added).
[136] (*Id.* at 4).
[137] (Ex. E)

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

\*\*\*

Rather than *immediately* dismissing the case, the Board instead elects to **deem Case No. 25-1505GC to be fully formed and hereby requires the Group Representative to show cause as to why dismissal of the group is not appropriate.**[138]

76.    The facts leading to the dismissal of their appeal forces Plaintiffs to take a stand: although recognizing that certain provisions of the Medicare Act grant the Board *discretionary* authority to take certain actions against providers with respect to their administrative appeals, in some circumstances rising to the level of dismissal of said appeals, that authority should not be exercised without regard to limits, and such decision making should be exercised by the deciding agency panel applying fairness, logic, good faith, and *sound* discretion. Above all, use of such power calls for a detailed and equitable analysis of unique circumstances for *each* matter before the PRRB, especially as it contemplates a dismissal that could deprive a provider (or providers, as in this case) of hundreds of thousands of additional DSH reimbursement to fund treatment of low-income patients. Most of the Board's stated rationale for its dismissal decision relating to the extraordinary circumstances *in this case* was unwarranted and demonstrates an egregious abuse of discretion to the point that some could surmise that the Board's dismissal decision was preordained and even biased against Plaintiffs. Such an extreme, terminating remedy reflects the Board's arbitrary and capricious manner when arriving at its decision.

## COUNT I

**Judicial Review Under the Medicare Act and the APA**
**(The Board's Dismissal of the CIRP Group appeal was Arbitrary, Capricious, an Abuse of Discretion, and Otherwise Contrary to Law)**

77.    Plaintiff Providers incorporate by reference paragraphs 1-76 of this Complaint.

---

[138] (*Id.* at 3) (emphasis added).

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

78.     The APA prohibits agency action that is "…arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;"[139]

79.     The Board's dismissal of Plaintiffs' CIRP Group appeal was arbitrary, capricious, an abuse of discretion, and otherwise contrary to the Medicare Act.

**REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully requests for an Order:

(a)     Reversing and setting aside the PRRB decision of dismissal of the Plaintiffs' CIRP group appeal.

(b)     Declaring invalid and enjoining application of the Secretary's 2023 Final Rule;

(c)     Remanding the appeal back to the Board for full adjudication on the merits;

(d)     Awarding the costs of suit incurred by Plaintiffs;

(e)     Awarding Plaintiffs interest per 42 U.S.C. §1395oo(f)(2); and

(f)     For such other and further relief as the Court may deem just and proper under the circumstances.

Dated: May 9, 2026                    Respectfully submitted,

                                      ALAN J. SEDLEY LAW CORPORATION

                                      By: */s/ Alan J. Sedley*
                                      Alan J. Sedley, Esq. Bay # OH0017
                                      18880 Douglas, Suite 417
                                      Irvine, CA 92612
                                      Phone: 818.601.0098
                                      asedley@sedleyhealthlaw.com

                                      *Attorney for Plaintiffs*

---

[139] 5 U.S.C. § 706(2)(A).

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT